UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       - against -                04 CR 966 (S-2)(ERK/VVP)

KENNETH MCGRIFF,
VICTOR WRIGHT,
DENNIS CROSBY,
NICOLE BROWN and
VASH-TI PAYLOR,

                   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York

Tracy Lee Dayton
Carolyn Pokorny
Assistant United States Attorneys
      Of Counsel

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      B.    The Murders of Eric Smith, Karon Clarrett and Dwayne Thomas . . . . . . . . . . . 3
      C.    BROWN's January 30, 2003 Interview with Detectives . . . . . . . . . . . . . . . . . . . 5
      D.    BROWN's August 2003 Post-Arrest Statement . . . . . . . . . . . . . . . . . . . . . . . . 6
      E.    BROWN's November 2004 Post-Arrest Statement . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.    The Defendants' Motion for a Bill of Particulars . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      B.    The Government's Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      C.    BROWN's Requests for a Bill of Particulars . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      D.    WRIGHT's Requests for Particulars as to Count 17
            (Narcotics Trafficking Conspiracy) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      E.    WRIGHT's Requests for Particulars as to Counts 1 and 2
            (RICO and RICO Conspiracy) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      F.    WRIGHT's Requests for Particulars as to Counts 6-12
            (The Maryland Homicides and Firearms Charges) . . . . . . . . . . . . . . . . . . . . . . 19
      G.    WRIGHT's Requests for Particulars as to Other Counts . . . . . . . . . . . . . . . . . 20
      H.    WRIGHT's Discovery Requests as to the Maryland Homicides . . . . . . . . . . . . 21
      I.    WRIGHT's Discovery Requests as to Property Recovered from His Jail Cell . . 21
      J.    WRIGHT's Discovery Requests as to His August 28, 2001 Arrest . . . . . . . . . 22
      K.    WRIGHT's Other Discovery Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.   The Court Should Deny WRIGHT's Motion to Strike Language from the Indictment . 23

III.  BROWN's Suppression Motion Should Be Denied without a Hearing . . . . . . . . . . . . 25

      A.    Defendant BROWN Is Not Entitled To A Hearing . . . . . . . . . . . . . . . . . . . . . . 25
      B.    BROWN's January 30, 2003 Statement Was Not Made While in Custody . . . . 27
      C.    The Government Does Not Intend to Offer BROWN's August 1, 2003
            Statement at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
      D.    BROWN's November 10, 2004 Statement Was Spontaneous and
            Not the Product of Custodial Interrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IV.   DEFENDANT PAYLOR'S SEVERANCE MOTION IS PREMATURE . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## PRELIMINARY STATEMENT

Defendants NICOLE BROWN and VICTOR WRIGHT seek a bill of particulars.  The government agrees to furnish some of the requested particulars, and also provide the 3500/<u>Giglio</u> material and trial transcripts of the government witnesses who testified against co-defendants Irving and Christopher Lorenzo.  As to the remaining requests, their applications should be denied because they have abundant information regarding each allegation in the indictment based on the indictment itself, disclosures made during bail hearings and status conferences, and the substantial discovery.

BROWN also moves to suppress statements made to law enforcement on January 30, 2003 and August 1, 2003, claiming the statements were obtained involuntarily and in violation of her Fifth and Fourteenth Amendment Rights.  In addition, BROWN moves to suppress statements made to law enforcement on November 10, 2004, claiming that the statements were obtained in violation of her Fifth, Sixth and Fourteenth Amendment rights.   As explained in detail below, because BROWN failed to file a sworn affidavit supporting her claims, her motion to suppress should be dismissed without a hearing.  Alternatively, if BROWN remedies this deficiency, the government respectfully submits that the defendant's motions should be denied in their entirety.

Defendant VASH-TI PAYLOR moves to sever her trial from that of her co-defendants, on the ground that "a death-qualified jury will be required to try the murder charges against [her co-defendants]."  However, because no decision has been made whether to seek the death penalty against any of her co-defendants, PAYLOR's severance motion is premature.

Finally, VICTOR WRIGHT also moves to strike portions of the indictment, specifically, the words "others" "elsewhere" and "including."  WRIGHT's motion should be denied because he fails to demonstrate that these words serve no useful purpose and are prejudicial.

1

I.      **Introduction**

In January 2005, KENNETH "SUPREME" MCGRIFF, together with 8 individuals and two corporations, were charged in a superseding indictment with racketeering and other offenses.  The superseding indictment alleges that from January 1997 through 2003, MCGRIFF and his co-defendants were members of a violent drug trafficking organization, referred to in the superseding indictment as the "McGriff Enterprise," that committed a variety of crimes, including murder, drug trafficking and money laundering.  A detailed statement of facts is set forth in the government's memorandum of law in opposition to severance dated May 6, 2005.  The present motion sets forth those facts directly relevant to the defendants' pretrial motions.

A.      **Background**

In the early 1980s, MCGRIFF founded the "Supreme Team," a violent drug gang that operated in and around the Baisley Park Houses in Jamaica, Queens.    In 1989, MCGRIFF was convicted, upon his plea of guilty in the Eastern District of New York, of engaging in a continuing criminal enterprise ("CCE") and was sentenced to a 12-year term of imprisonment.  In 1993, 7 other Supreme Team members were convicted of narcotics trafficking and racketeering after a jury trial in the Eastern District of New York, and also sentenced to lengthy terms of imprisonment.

In 1995, MCGRIFF was released from prison after serving approximately 8 years of his 12-year sentence.  MCGRIFF promptly assembled a new team of drug dealers and those willing to commit acts of violence at his behest and aligned himself with seemingly legitimate business enterprises to launder drug proceeds.  This new organization, the "McGriff Enterprise," also became involved in a wide variety of criminal conduct, including racketeering, drug trafficking, illegal use of firearms, money laundering and homicide.

2

The superseding indictment, filed in January 2005, charges the following: (1) the August 20, 2001 murder of Karon Clarrett and Dwayne Thomas in Baltimore, Maryland, carried out by MCGRIFF's associate and co-defendant, VICTOR WRIGHT, and others because of their belief that Clarrett was cooperating with law enforcement against the McGriff Enterprise; (2) the July 16, 2001 murder of Eric Smith, also known as "E Money Bags," (hereinafter "E Money Bags") in Queens on July 16, 2001, plotted by MCGRIFF, together with co-defendants Nicole BROWN, DENNIS CROSBY and others; (3) distribution of narcotics by MCGRIFF, together with co-defendants VICTOR WRIGHT, DENNIS CROSBY and VASH-TI PAYLOR; and (4) money laundering by MCGRIFF, together with executives and employees of a rap music record label.[1]

The government anticipates that, if a hearing were held, the following facts would be established.

B.     **The Murders of Eric Smith, Karon Clarrett and Dwayne Thomas**

On July 16, 2001, Eric Smith, also known as "E Money Bags," was shot to death while seated in his truck near defendant BROWN's home at 214-14 111 Road in Queens, New York. According to numerous sources, Smith's murder was in retaliation for his involvement in the December 1999 murder of a McGriff's Enterprise member, Colbert Johnson, also known as "Black Just." Johnson had been among MCGRIFF's most trusted associates. Thus, MCGRIFF and various members of his organization repeatedly vowed revenge against Smith.

Approximately one month after Smith's murder, on August 20, 2001, Karon Clarrett

---

[1] Judge Korman severed the money laundering charges against the corporate defendants, Irving Lorenzo, Christopher Lorenzo, Cynthia Brent and Ronald Robinson. That trial recently resulted in an acquittal of the Lorenzos. Brent pleaded guilty to structuring charges, and Robinson has agreed to plead guilty to tax charges.

and Dwayne Thomas were shot to death in the parking lot of an apartment complex in Owings Mills, Maryland. Following the homicide, Baltimore detectives obtained a search warrant for defendant VASHTI PAYLOR's apartment, which was located in the apartment building in front of which Clarett and Thomas were murdered. Inside PAYLOR's apartment, detectives recovered a large cache of narcotics and cash, documentary and forensics evidence linking MCGRIFF to the apartment and a stolen firearm.[2]   Detectives also discovered numerous videotapes inside PAYLOR's apartment, including a date-stamped videotape that depicted surveillance of Eric Smith in the days and hours preceding his murder. In the video recording, the truck in which Smith was seated while murdered is prominently displayed.

After recovering the above-described videotape, Baltimore Homicide Detectives contacted NYPD Detectives Anthony Castiglia, William Courtney and Patrick Dolan. Based upon their investigation, the NYPD detectives determined that the videotape was recorded from inside defendant BROWN's apartment on 111th Road in Queens. For example, the detectives recognized the interior of BROWN's apartment, which is visible on the tape. Additionally, a child who appears on the tape was identified as BROWN's daughter. Most significantly, BROWN's voice is recorded on the videotape. In fact, shortly before the tape ends, BROWN is heard providing directions to the victim Smith's location to a person with whom she is speaking on the telephone while maintaining the video camera focused on Smith.

---

[2]In June 2003, MCGRIFF was sentenced in the District of Maryland to 37-months imprisonment following his plea of guilty to the possession of a firearm by a convicted felon.

4

C.     **BROWN's January 30, 2003 Interview with Detectives**

On January 30, 2003, NYPD Detectives Castiglia and Dolan approached BROWN near her home in Queens, New York.  The detectives, who were in plainclothes and driving an unmarked police vehicle, pulled alongside BROWN, identified themselves and asked if they could speak with BROWN.  The detectives did not get out of their car.    BROWN asked Detective Castiglia if she was under arrest.  When Castiglia told her that she was not, BROWN agreed to accompany the detectives to the Precinct for an interview.

During the interview, which took place in an interview room, BROWN spoke to Detectives Castiglia and Dolan about the Eric Smith homicide.  BROWN admitted, in substance, that a few days before the homicide in July 2001, defendant Dennis Crosby left a video recorder at her home.  BROWN stated that Crosby made portions of the videotape surveilling Smith over the course of several days.  On the day of Smith's murder, Crosby remained at BROWN's house during the majority of the day.  About 3 hours before Smith was killed, Crosby left BROWN's apartment and told her to keep an eye on Smith's truck and to videotape it.   Approximately one hour before the murder, Crosby called BROWN.  She told him that the victim's truck was still parked outside.  BROWN claimed that, at the time, she did not know why Crosby was making the surveillance tapes, but that she should have guessed that they were, at the very least, planning to rob him.

During the January 30th interview, BROWN also told detectives about Crosby's relationship to MCGRIFF.  Specifically, BROWN stated that following Smith's murder, Crosby went to jail for a narcotics charge.  While incarcerated, Crosby kept in touch with MCGRIFF through BROWN.  Specifically, Crosby called BROWN, who in turn placed three-way calls connecting Crosby to MCGRIFF.

5

Detectives Castiglia and Dolan asked BROWN if she would provide a written statement.  While BROWN indicated that she did not want to write the statement herself, she did agree to sign a statement.  Detective Castiglia then wrote the substance of BROWN's interview on two pieces of paper.  BROWN reviewed the statement, made a handwritten addendum and signed both sheets of paper.

At the conclusion of the January 30th interview, which lasted approximately 90 minutes, BROWN was asked if she was willing to speak to prosecutors from the U.S. Attorney's office regarding the Smith homicide.  BROWN was advised that she would be provided an attorney, free-of-charge, to be present while she spoke to the prosecutors is she so desired.  BROWN agreed to go to the U.S. Attorney's Office on February 3, 2003 to meet with federal prosecutors.  BROWN, who was neither under arrest nor threatened with arrest, was driven home.

NYPD detectives spoke with BROWN two times prior to the scheduled February 3rd appointment to confirm that she still planned to attend.  Further, prosecutors arranged to have CJA counsel present for the interview.  On the morning of February 3, 2003, Detectives Castiglia and Dolan attempted to contact BROWN.  BROWN neither responded to their calls nor appeared for the scheduled appointment.

**D.    BROWN's August 2003 Post-Arrest Statement**

For the next several months, detectives attempted to locate BROWN.  Eventually, Detectives Castiglia and Dolan discovered that BROWN had withdrawn her daughter from school and moved without providing any forwarding information.  In May 2003, the government obtained a material witness warrant for BROWN's arrest.

In August 2003, NYPD detectives learned from a welfare investigator that BROWN

would be appearing at a Manhattan welfare office for a meeting regarding her welfare eligibility status.  When BROWN arrived for the 10:30 a.m. interview, Detectives Castiglia, Dolan and Courtney were already present at the welfare office.  After BROWN's meeting with a welfare investigator, the detectives asked BROWN to accompany them to the precinct to speak with them further regarding the Smith homicide.  BROWN agreed.

En route to the Precinct, BROWN was asked why she did not keep her appointment with the U.S. Attorney's Office.  BROWN explained that she had moved out of her house due to personal issues and that she was not "actively trying to avoid" speaking to the detectives.  BROWN then advised the detectives that after the January 2003 interview, she had a "free consultation" with attorney Robert Simels, MCGRIFF's longtime attorney.  BROWN originally claimed that she found Mr. Simels' name in the yellow pages.  She then acknowledged that one of MCGRIFF's associates actually took her to speak to Mr. Simels after he learned that she had been interviewed by the police. She further acknowledged that MCGRIFF's associate was present in the room while BROWN spoke to Mr. Simels regarding the substance of the January 30th interview.

BROWN then asked Detective Castiglia if she was under arrest.  Detective Castiglia advised BROWN that he had a federal warrant for her arrest and that she was going to be taken into custody.  Detective Castiglia placed BROWN in handcuffs just prior to their arrival at the precinct.

Once inside the precinct, BROWN asked to call attorney Robert Simels.  Detectives Castiglia and Dolan suggested that BROWN may wish to contact an attorney that did not have a prior relationship with Kenneth MCGRIFF.  However, BROWN insisted that she wished to speak to Simels and was permitted to place the call.

BROWN was unable to contact Simels directly.  Instead she spoke to one of Simels'

associates, Alexandra Vandoros.   When Ms. Vandoros asked to speak to Detective Castiglia,.

Castiglia advised her that BROWN was going to be transported to the United States Marshals in

Brooklyn.   Castiglia returned the phone to defendant BROWN, who had an additional, short

conversation with Vandoros before hanging up the phone.   Neither defendant BROWN nor Ms.

Vandoros ever advised Detective Castiglia that Simels, Vandoros or anyone else at the firm

represented the defendant.   Additionally, BROWN never indicated that she did not wish to continue

speaking with the detectives.   Nonetheless, the detectives ceased speaking to BROWN with the

exception of again suggesting that she may wish to have an attorney appointed who did not have a

prior relationship with MCGRIFF.   Notably, at the time of her arraignment on the material witness

warrant, neither Simels, nor anyone from his office, appeared to represent BROWN.   Instead she

was appointed CJA attorney, Jeremy Orden.   BROWN was released on bail in connection with the

material witness warrant.

      E.      **BROWN's November 2004 Post-Arrest Statement**

      The following year, in November 2004, a federal grand jury indicted BROWN,

CROSBY and MCGRIFF for the murder of Eric Smith.   On November 9, 2004, detectives arrested

BROWN on the indictment.   The detectives advised her of her Miranda rights, which BROWN

indicated she understood.   The detectives transported BROWN to the 105 Precinct and placed her

in a holding cell.

      The following morning, November 10, 2004, the detectives took BROWN to the U.S.

Attorney's Office to meet with prosecutors and her court-appointed counsel, Jeremy Orden, Esq.

BROWN spoke privately and at length with Mr. Orden.   Mr. Orden informed the prosecutors that

he had advised his client to remain silent, and not to make any statements.   Orden, Detective

Castiglia and the prosecutor then left the room where BROWN was seated.

Within moments of Orden walking out of the room, BROWN ran to the door of the proffer room and yelled, "Wait, tell him to come back, there's something I didn't tell him."  When Mr. Orden returned, he conferred privately with BROWN.  Mr. Orden told prosecutors once again that he had advised BROWN to remain silent.  Mr. Orden stated he had to leave, and promptly did.

Following Mr. Orden's departure, Detective Castiglia remained directly outside the room in which BROWN was seated while waiting for Detective Dolan, whose presence was required to return defendant BROWN to the U.S. Marshals' Office.   BROWN called to Detective Castiglia and asked him to come in the room.  BROWN then asked Castiglia if he had any children.  When Detective Castiglia said he did, BROWN stated that having children would help him understand what she was about to say, "even though her lawyer told her not to."  BROWN said she wanted to tell the truth because "holding back" only got her in more trouble and that she was afraid of losing her daughter.

BROWN told the Detective, in substance, that she figured out that MCGRIFF was behind Smith's murder because on a number of occasions prior to the murder she heard defendant Crosby telling MCGRIFF, "Don't worry Homey, we're gonna get that nigger (referring to Smith)." BROWN further recounted that Crosby brought her a video camera and instructed her to videotape Smith in the days preceding the murder.  BROWN also admitted that the person to whom she was speaking in the conversation recorded on the tape, wherein she is heard giving directions to Smith's location, was Crosby.

BROWN stated that after her January 30, 2003 interview with detectives, she told Crosby what had occurred.  Sometime thereafter, Crosby, BROWN and John "B.J." Bryant went to

Mr. Simels' office in Manhattan, where they discussed the substance of the police interview. Simels told BROWN that he was a "very good lawyer" and would "take care of her." Simels gave BROWN his business card, and told her that she should expect the police to be back sometime in the future. Simels instructed her that when this happened, BROWN should give the police his business card, and not say anything.

Detective Castiglia neither asked BROWN any questions nor made any statements while BROWN made these statements. When she was finished explaining the circumstances surrounding Smith's murder, BROWN asked Detective Castiglia if telling the truth would help her get out of jail. Castiglia advised BROWN that he believed telling the truth was always the best course, but that he had no authority regarding her status with the court. Detective Castiglia did agree that he would let the appropriate people know what had just transpired. BROWN repeatedly asked Detective Castiglia to promise that he would help her. Castiglia informed BROWN that he could not make any promise or guarantee regarding whether she would go to jail, or the length of any jail sentence, but that if she cooperated and continued to tell the truth that he would advocate on her behalf with the U.S. Attorney's Office for a favorable 5k letter.

**ARGUMENT**

I.    **The Defendants' Motion for a Bill of Particulars**

    A.    **Applicable Law**

It is well-settled that the scope and function of a bill of particulars is to furnish facts supplemental to those contained in the indictment that are necessary to inform the defendant of the charges against him with sufficient precision to enable him to prepare his defense, to avoid or minimize the danger of surprise at trial, and to enable the accused to plead his acquittal or conviction in bar of further prosecution for the same offense. Wong Tai v. United States, 273 U.S. 77, 82 (1927); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990); United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); United States v. Cuff, 2000 WL 863119, *7 (S.D.N.Y. 2000).

Thus, a bill of particulars will not be required unless the "charges of an indictment are so general that they do not advise the defendant of the specific acts of which he is accused." Torres, 901 F.2d at 234 (quoting United States v. Feola, 651 F. Supp. 1068, 1135 (S.D.N.Y.1987), aff'd, 875 F.2d 857 )(2d Cir. 1989). This holds true regardless of whether a defendant is charged with substantive violations or as part of a criminal conspiracy. United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975)(no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge). "The ultimate test of the appropriateness of a bill of particulars is whether the information is necessary, not whether it is helpful to the defendant." United States v. Weinberg, 656 F. Supp. 1020, 1029 (E.D.N.Y. 1987) (citations omitted); United States v. Leighton, 265 F. Supp. 27, 35 (S.D.N.Y. 1967).

Because the bill of particulars serves merely to inform the defendant of the nature of the charges, it may not be used to acquire "evidentiary detail," Torres, 901 F.2d at 234, or as an

11

investigative tool for the defense, United States v. Salazar, 485 F.2d 1272, 1277-78 (2d Cir. 1973);

see also United States v. Tramunti, 513 F.2d 1087 (2d Cir.1975) (defendants not entitled to discover

exact time and place at which crime occurred, the identities of witnesses or documents that will

prove the crimes charged).   Nor should it be used as a device to obtain detailed disclosure of the

Government's evidence prior to trial, or as a means to inquire into the Government's legal or

evidentiary theory of its case.   United States v. Gottlieb, 493 F.2d 987, 994 (2d Cir. 1974); United

States v. Lebron, 222 F.2d 531, 535-36 (2d Cir. 1955); United States v. Zuluaga, 65l F. Supp. 746,

750-75l (E.D.N.Y. l986) (government not required to disclose its evidence or its legal theory, or the

precise manner in which narcotics violations were committed).   The Government cannot be

compelled in a bill of particulars to disclose the manner in which it will attempt to prove the charges

against the defendant or to describe the precise manner in which the defendant committed the crime

charged.  Torres, 901 F.2d at 233-24; United States v. Facciolo, 753 F. Supp. 449, 450-51 (S.D.N.Y.

1990), aff'd, 968 F.2d 242 (2d Cir. 1992);  United States v. LaMorte, 744 F. Supp. 573, 577

(S.D.N.Y. 1990). Defendants are also not entitled to discover details as to how and when the

conspiracy was formed, when each participant entered it, and the manner in which the conspiracy

operated.  See Feola, 651 F. Supp. at 1132; United States v. Young & Rubicam Inc., 741 F. Supp.

334, 349 (D. Conn. 1990).

              Ultimately, the decision whether to grant a bill of particulars rests within the sound

discretion of the district court.  United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984).  Broad

requests for information such as exact dates, places, and times in which events occurred and the

respective roles and manner of participation of others in such events "ignore the proper scope and

function of a bill of particulars" and are to be denied.  United States v. Volpe 42  F. Supp.2d 204,

225 (E.D.N.Y. 1999); see also United States v. Aliperti, 867 F. Supp. 142 (E.D.N.Y. 1994) (as a general rule, defendants not entitled to detailed evidence about a conspiracy to properly prepare for trial); United States v. Santoro, 647 F. Supp. 153, 188 (E.D.N.Y. 1986) (bill of particulars "is not to be used, however, to force the government to disclose its evidence . . or its legal theory") (citations omitted).  Moreover, a bill of particulars confines the government's proof at trial to the particulars furnished.  See, e.g., United States v. Muyet, 945 F. Supp. 586, 601 (S.D.N.Y. 1996) (citing, inter alia, United States v. Glaze, 313 F.2d 757, 759 (2d Cir. 1963)).  "Therefore, a request for a bill of particulars should be denied when it would unduly restrict the Government's ability to present its case."  Id. (citations omitted) (refusing a request for details on when and where a defendant carried firearms).

B.    **The Government's Disclosures**

On June 23, 2005, a federal Grand Jury in the Eastern District of New York returned a 24-count superseding indictment against defendants MCGRIFF, CROSBY, VICTOR WRIGHT, NICOLE BROWN and VASH-TI PAYLOR.  The superseding indictment charged defendants with, inter alia, racketeering and racketeering conspiracy, murder, narcotics distribution, money laundering and currency structuring.   The 42-page indictment contains numerous specific details concerning the crimes with which the defendants are charged, including a description of the enterprise in furtherance of which the above-described murders was committed, and sets forth the approximate dates of each crime.

In February 2005,  the government began providing extensive discovery including the substance of the defendant's statements, telephone records, pager records, two-way text messages, financial records, hotel records, several search warrant affidavits, department of motor

13

vehicle records, property vouchers, laboratory reports related to narcotic analyses, fingerprints comparisons and ballistic analyses, copies of documentary evidence seized pursuant to arrest and/or search warrants, videotapes, notice of expert testimony the government will offer at trial and copies of or notice of other evidentiary items that the government intends to offer at trial.

The government also filed extensive detention letters addressing BROWN and WRIGHT.   Further, as noted at the outset, the government recently agreed to provide to the defendants the 3500/<u>Giglio</u> material and trial transcripts for the government witnesses who testified at a recent trial against co-defendants Irving and Christopher Lorenzo.

C.   **BROWN's Requests for a Bill of Particulars**

1.   <u>With respect to Count 3, the benefit she conspired to obtain</u>: United States currency.  We reserve the right to introduce evidence of additional benefits.

2.   <u>With respect to Count 4, whether she is charged as a principal or accomplice, and if an accomplice, the person or persons she aided and abetted, and the benefit related to the McGriff Enterprise that the accomplices allegedly obtained.</u>   BROWN is liable as an accomplice. The persons she aided and abetted includes, but is not limited to, her co-defendants KENNETH MCGRIFF and DENNIS CROSBY.  We submit that we are not obligated to provide further evidentiary detail because this is not the function of a Bill of Particulars, and note that BROWN cites no legal authority for her request.   Her demand for a bill of particulars should not be granted because she fails to establish that "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  <u>United States v. Torres</u>, 901 F.2d 205, 234 (2d Cir. 1990) (quotation and internal citation omitted)(upholding district court's discretion to deny a motion for a bill of particulars seeking (1) the date when defendant joined the conspiracy;

14

(2) the identity of the "known and unknown" coconspirators referenced in the indictment; (3) the precise dates and locations that the defendant was alleged to have assisted in the transportation and safeguarding of narcotics).

   3. <u>With respect to Count 5 (firearms possession in connection with the homicide of Eric Smith), whether BROWN is a principal or accomplice, and if an accomplice, the persons or persons she aided, the time and place of that person's possession of the firearm.</u> BROWN is liable as an accomplice. The persons she aided and abetted includes, but is not limited to, her co-defendants KENNETH MCGRIFF and DENNIS CROSBY. The time and place of the possession of the firearm included the days and hours leading up to the homicide, which occurred on July 16, 2001 at approximately 9:45 p.m. We submit that we are not obligated to provide further evidentiary detail, for the reasons stated above.

  D. **<u>WRIGHT's Requests for Particulars as to Count 17 (Narcotics Trafficking Conspiracy)</u>**

   1. <u>The start and end date of his participation in the charged conspiracy</u>: WRIGHT participated in the drug conspiracy from at least January 1997 through his arrest in Queens on August 29, 2001. We reserve the right to introduce evidence at trial regarding his participation in the charged conspiracy both before and after these dates.

   2. <u>The dates and locations of any meetings of conversations at which the government will contend that Wright joined the conspiracy.</u> The Court should deny this request. The defendant already has abundant information regarding the drug conspiracy allegation in the indictment based on the indictment itself, disclosures made during bail hearings and status conferences, and based upon the substantial amount of documentation and information provided in the course of discovery, including the 3500 material and trial testimony for several government

15

witnesses who will testify against WRIGHT.  See United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984) (noting that a court may consider information provided during discovery when considering the need for a bill of particulars); United States v. Canty, 971 F. Supp. 687, 690 (N.D.N.Y. 1997)("the Indictment, coupled with the discovery information the government has thus far provided to defendants, sufficiently apprises [the defendants] of the crime charged and the general outline of the government's case against them making defendants' request for a bill of particulars unnecessary").   WRIGHT is not entitled to discover details as to how and when the conspiracy was formed, when each participant entered it, and the manner in which the conspiracy operated.  See Feola, 651 F. Supp. at 1132; United States v. Young & Rubicam Inc., 741 F. Supp. at 349; United States v. Aliperti, 867 F. Supp. 142.

Thus, by seeking a bill of particulars, the defendant now seeks to have the government disclose the precise nature of its evidence at trial and to confine the government's proof to the particulars furnished.  The defendant is simply not entitled to such information or to restrict the government in such a way.  WRIGHT possesses a voluminous amount of information upon which to rely in preparing a defense.  Accordingly, the government respectfully submits that the requests for bills of particulars should be denied.

3.     The date each of the other defendants allegedly joined the conspiracy.  The other defendants, like WRIGHT, participated in the drug conspiracy from at least January 1997, and continued through December 2003.  We reserve the right to introduce evidence at trial regarding the defendants' participation in the charged conspiracy both before and after these dates.

4.     The date, location and nature of each over act in furtherance of the conspiracy. The defendant is not entitled to this information.  See ¶ 2 above.

16

5.    The date, location and nature of each overt act committed by each of the other defendants in furtherance of the conspiracy, and the identities of all co-defendants with whom they acted as to each.  The defendant is not entitled to this information.  See ¶ 2 above.

6.    The names of all persons the government claims were co-conspirators, including those referred to as the "others" in Count 17.  While we believe that the defendant is not entitled to this information, we agree to turn over the names of co-conspirators to the extent that these names were disclosed at the trial of WRIGHT's co-defendants.  Those names are contained in the 3500 material and trial testimony of the government's witnesses.   However, we reserve the right to introduce evidence of additional coconspirators at trial.

7.    The role WRIGHT allegedly played in the narcotics trafficking conspiracy, and specify which controlled substances he allegedly conspired to distribute, cocaine base, cocaine and/or heroin.   The conspiracy encompassed all three controlled substances.  WRIGHT's role is detailed, to a large extent, in the 3500 material and trial testimony of the government witnesses that will be provided to WRIGHT.  We reserve the right to introduce additional evidence regarding other roles WRIGHT played in the conspiracy.

E. **WRIGHT's Requests for Particulars as to Counts 1 and 2 (RICO and RICO Conspiracy)**

1. Describe how the named defendants functioned as an "enterprise" with respect to the drug trafficking activities the group allegedly engaged in. This is already set forth in the government's speaking indictment at ¶¶ 1-12. Moreover, further detail of the McGriff Enterprise is set forth in the government's 3500 material and testimony elicited from government witnesses at trial. We reserve the right to introduce additional enterprise evidence at trial. No further detail is required, for the reasons stated above. As the Second Circuit has observed, the caselaw regarding disclosure does not "imply that even in a RICO case the prosecution must always disclose in advance of trial every act it will [seek to] prove that may violate some criminal statute." United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988).

2. Specify the manner in which WRIGHT was either employed by or associated with the McGriff Enterprise. Again, this is set forth already in the indictment, the government's 3500 material and testimony elicited from government witnesses at trial. However, we reserve the right to introduce additional evidence regarding WRIGHT's employment and association with the McGriff Enterprise at trial.

3. The date WRIGHT joined the McGriff Enterprise, including the dates and locations of any meetings or conversations at which the government will contend he joined, and the date he last participated in the conspiracy. WRIGHT participated in the drug conspiracy from at least January 1997 through his arrest in Queens on August 29, 2001. We reserve the right to introduce evidence at trial regarding his participation in the charged conspiracy both before and after these dates. As for the requested information regarding meetings and conversations, the Court should deny this request. The defendant already has abundant information based on the indictment

18

itself, disclosures made during bail hearings and status conferences, and the information provided in discovery, including the 3500 material and trial testimony for several government witnesses who will testify against WRIGHT.

4.      The names of co-conspirators.  While we believe that the defendant is not entitled to this information, we agree to turn over the names of co-conspirators to the extent that these names were disclosed at the trial of WRIGHT's co-defendants.  Those names are contained in the 3500 material and trial testimony of the government's witnesses.   However, we reserve the right to introduce evidence of additional coconspirators at trial.

F.      **WRIGHT's Requests for Particulars as to Counts 6-12 (The Maryland Homicides and Firearms Charges)**

1.      The identity of the "others" with whom WRIGHT acted and the specific location referred to by the term "elsewhere."  This information was previously disclosed to the defendant during a reverse proffer with defense counsel in attendance.  However, we reserve the right to introduce evidence of additional coconspirators and locations at trial.

2.      Whether WRIGHT is accused of acting as a principal or accomplice and, if the government's theory is that Mr. Wright did not act alone in committing the murders, the identity of the individuals with whom he allegedly acted with and the conduct of each person involved. Again, this information was previously disclosed to the defendant during a reverse proffer with defense counsel in attendance.  WRIGHT is liable as both a principal and accomplice.  We reserve the right to introduce evidence of additional coconspirators and their conduct at trial.

19

3.      <u>The nature of the agreement to pay a thing of pecuniary value</u>.  As WRIGHT notes in his motion papers, a government witness states that the murders were accomplished, in part, to extinguish a debt.  (Def. Mem. at 17).   We reserve the right to present additional evidence of additional financial motives.

4.      <u>How the homicides served to gain WRIGHT's entrance to the enterprise or to maintain or increase his position in the enterprise</u>.  Please be advised that WRIGHT committed these murders, in part, to eliminate potential witnesses who were in a position to testify about WRIGHT's involvement with the McGriff Enterprise, and the crimes of racketeering, narcotics trafficking, money laundering and violence.  We reserve the right to present additional evidence about how the murders served to maintain or increase WRIGHT's position in the McGriff Enterprise.

5.      <u>Specify the offenses that the murder victims were prevented from communicating with law enforcement about by virtue of their killings</u>.  See ¶ 4.  Again, we reserve the right to present evidence regarding additional offenses that the murder victims were prevented from communicating to law enforcement.

G.      **WRIGHT's Requests for Particulars as to Other Counts**

1.      <u>With respect to Count 18 (drug trafficking in North Carolina) and 21 (firearms count related to the drug conspiracy), identify the "others" with whom WRIGHT allegedly acted and the specific locations referred to by the term "elsewhere"</u>.  While we believe that the defendant is not entitled to this information, we agree to turn over the names of co-conspirators to the extent that these names were disclosed at the trial of WRIGHT's co-defendants.  Those names are contained in the 3500 material and trial testimony of the government's witnesses.   However, we reserve the

right to introduce evidence of additional coconspirators at trial.  The defendant is not entitled to any further evidentiary detail, which is not the function of a bill of particulars.

2.      Regarding Count 21 (firearm possession in connection with drug trafficking), the dates and locations of all such conduct by WRIGHT, and whether WRIGHT is accused as a principal or accomplice.   Please be advised that WRIGHT is liable as both a principal and accomplice.  The defendant is not entitled to any further evidentiary detail, which is not the function of a bill of particulars.

H.      **WRIGHT's Discovery Requests as to the Maryland Homicides**

1.      Reports regarding ballistics evidence recovered from the scene of the homicides.  We have turned this over to WRIGHT.

2.      **Crime scene reports and photographs of the homicide scene and the Maryland "stash house"**: On December 8, 2005, we made available for viewing all such photographs in our possession.   The homicide detectives in Maryland have informed me that they have additional homicide scene photographs, which they are in the process of copying for me.  I will provide copies to defense counsel as soon as I receive them.

3.      Reports of physical evidence recovered from the homicide scene.  This was turned over to the defense on December 8, 2005.

I.      **WRIGHT's Discovery Requests as to Property Recovered from His Jail Cell**

1.      A list of property recovered from Victor Wright's cell.  Although we already turned this over, we did so again on December 8, 2005.

2.      Search warrant for the cell: Although we already turned this over, we did so again on December 8, 2005.

3.      Requests for forensic tests on any property taken from the cell and the results of such tests.  The defense is in possession of all forensic tests and requests for tests.

**J.      WRIGHT's Discovery Requests as to His August 28, 2001 Arrest**

1.      Information concerning cell phones recovered pursuant to WRIGHT's arrest. The cellphones themselves were made available to WRIGHT on December 8, 2005.  The additional information requested is not in the government's possession.

2.      Copies of miscellaneous papers recovered from WRIGHT.  Copies already have been provided, but we will do so again.

3.      A complete list of all property recovered.  We already turned over the vouchers for all items recovered.

**K.      WRIGHT's Other Discovery Requests**

1.      Wright's criminal history report.  Defense counsel acknowledges that he already has this.

2.      Written summaries of any anticipated testimony to be given by every expert witness the government intends to call at trial.  The government intends to call medical examiners as experts in forensic pathology to testify about a number of homicides; the government also intends to call a narcotics analyst regarding several drug seizures; and a fingerprint examiner to testify regarding prints lifted and comparisons made from those prints.  The government will comply with Rule 16(a)(1)(E) by notifying the defense in a timely fashion of the identity of these experts and any additional experts that the government intends to call at trial.  At that time, the government will also provide a summary of the opinion and qualifications of those experts.

3.      Loss or destruction of evidence.  At this time the government is not aware of

any lost or destroyed evidence.

          4.    Request for *Brady* material.  The government is aware of and will comply with its obligation to produce exculpatory material or information under Brady v. Maryland, 373 U.S. 83 (1963).  The government will furnish the defense before trial with information or material regarding payments, promises of immunity, leniency, or preferential treatment, if any, made to prospective witnesses within the scope of Giglio v. United States, 405 U.S. 150 (1972), and Napue v. Illinois, 360 U.S. 264 (1959).  The government will furnish before trial information or material regarding any prior convictions of any co-conspirator, accomplice or informant who will testify for the government at trial.  Moreover, as noted above, the government has agreed to provide the 3500 and Giglio material for those witnesses who already have testified for the government at the trial of WRIGHT's co-defendants.

          As for WRIGHT's request for access to a government informant (Def. Mem. at 17) with allegedly exculpatory information about the Maryland homicides, this request should be denied.  First, the informant will be called as a trial witness or made available to the defense at trial.  Second, the informant has inculpatory information regarding WRIGHT's involvement in the homicides.  Thus, by definition, the informant does not have Brady evidence.  Third, to the extent the informant's knowledge of events can be construed as Brady, this has already been disclosed to the defense, as WRIGHT himself acknowledges.

## II.    **The Court Should Deny WRIGHT's Motion to Strike Language from the Indictment**

          WRIGHT moves to strike references to "others," "elsewhere" and "including" on the grounds that they serve "no useful purpose and are prejudicial."  (Def. Mem. at 18-20).  This motion should be denied.

Pursuant to Fed.R.Crim.P. 7(b), it is well settled that a motion to strike surplusage from the indictment will be granted only when the movant sustains the heavy burden of demonstrating that the challenged terms are: (1) irrelevant to the crime charged; and (2) inflammatory and prejudicial.  United States v. Mulder, 273 F.3d 91, 99 (2d Cir. 2001).  In light of this standard, "if evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken."  United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir.1990) (internal citation and quotation omitted).  "Given this exacting standard, such motions are rarely granted." United States v. Coffey, 361 F.Supp.2d 102 (E.D.N.Y. Mar 29, 2005) (Glasser, J.)(citing United States v. DePalma, 461 F.Supp. 778, 797 (S.D.N.Y. 1978)).

Under this exacting standard, WRIGHT's motion to strike must be denied.  First, it should be noted that motions to strike purported surplusage in a case before Judge Korman is not as relevant as it might be before other judges, because Judge Korman typically does not read lengthy indictments to the jury.  If Judge Korman does provide the jury with a copy of the indictment during deliberations, that copy can be redacted according to the charges, allegations and evidence that remain relevant in light of the entire trial.  There is little purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.

Second, all the claimed surplusage is relevant, even if it does not describe elements of the offenses charged. Naturally, WRIGHT will be entitled to request limiting instructions during the trial and before the court charges the jury.  Such instructions will guarantee that the jury understands with what the defendants are and are not charged, but the defendants are not entitled to preclude the government from pleading and proving conduct that is relevant to the defendants' crimes. United States v. Turoff, 652 F.Supp. 707, 713-14 (E.D.N.Y. 1987) (Glasser, J.).

III.   **BROWN's SUPPRESSION MOTION SHOULD BE DENIED WITHOUT A HEARING**

BROWN moves to suppress statements made to law enforcement on January 30, 2003 based on the unsupported allegation in her brief that she made the statements during custodial interrogation without being advised of her Miranda rights.   BROWN's argument focuses on a recitation of facts designed to show that she was in custody during her interrogation and that any statement she made was done so involuntarily.[3]   BROWN further moves to suppress statements she made on August 1, 2003 claiming that the statements were taken in violation of her Fifth and Fourteenth Amendment rights.   Finally, BROWN moves to suppress statements made to law enforcement on November 10, 2004 claiming that the statements were taken in violation of her Fifth and Sixth Amendment rights.   For the reasons herein stated, BROWN's motion should be summarily dismissed due to her failure to file a factual affidavit to support her allegations.

A.   **Defendant BROWN Is Not Entitled To A Hearing**

Ordinarily a factual dispute over whether a defendant was interrogated in violation of her Fifth, Sixth or Fourteenth Amendment rights would result in a hearing.   See United States v. Mathurin, 148 F.3d 68,69-70 (2d. Cir 1998).   However, here BROWN fails to provide a sworn affidavit to the events in support of her claim that she was interrogated in violation of her rights.

As a general rule, the movant — i.e., the defendant —   bears the initial burden of production and persuasion with respect to a suppression motion.   See United States v. Arboleda, 633

_____

[3]While ordinarily, a factual dispute over whether a defendant was interrogated in violation of her Fifth, Sixth or Fourteenth Amendment rights would result in a hearing, see United States v. Mathurin, 148 F.3d 68,69-70 (2d. Cir 1998), here BROWN fails to provide an affidavit by a witness to the events in support of her claim that she was interrogated in violation of her rights.   Thus, her request for such a hearing on this issue, like her suppression request, should be denied.

F.2d 985, 989 (2d Cir. 1980).  Consequently, before the government must justify the voluntariness of a post-arrest statement, a defendant must make an initial demonstration that what occurred was unlawful.  Furthermore, a defendant is not entitled to a hearing upon her motion to suppress unless she (1) states contested facts which, if proven, would entitle her to the relief requested, and (2) supports such factual assertions with either testimony or an affidavit based on personal knowledge.  See, e.g., United States v. Caruso, 684 F. Supp. 84, 87 (S.D.N.Y. 1988) (citing United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967)).

An attorney's affidavit made on "information and belief," such as defense counsel has presented here, is insufficient to make that preliminary showing; rather, the defendant herself must set forth in an affidavit or testimony facts as to which she has personal knowledge.  See, e.g., Gillette, 383 F.2d at 848-49; United States v. Ruggiero, 824 F. Supp. 379, 393-94 (S.D.N.Y. 1993); United States v. Sierra-Garcia, 760 F. Supp. 252, 264 (E.D.N.Y. 1991) (Glasser, J.); United States v. Gregory, 611 F. Supp. 1033, 1044-45 (S.D.N.Y. 1985); United States v. Barr, 605 F. Supp. 114, 119 n.2 (S.D.N.Y. 1985).  Without an affidavit or testimony from the defendant that is (i) based on personal knowledge and (ii) contains "specific factual allegations of illegality," Gregory, 611 F. Supp. at 1044, a defendant is not entitled to a hearing on the motion.  Id.; see also Gillette, 383 F.2d at 848-49; Caruso, 684 F. Supp. at 87.

Here, the defendant has failed to submit a sworn affidavit.  The reason for the omission is apparent; the defendant wishes to attempt to purport to raise factual issues through the assertion of false facts, while avoiding the consequences attendant to making false, sworn statements.  The relevant case law precludes such gamesmanship.

Because the defendant has failed to submit sworn facts in support of a prima facie

26

case, her motion should be denied without a hearing.  See, e.g., United States v. Jailall, No. 00 CR 069, 2000 WL 1368055, at *8 (S.D.N.Y. Sept. 20, 2000) (defendant not entitled to an evidentiary hearing on motion to suppress because he submitted no affidavit of personal knowledge); United States v. Fruchter, 104 F. Supp. 2d 289, 308 (S.D.N.Y. 2000) (in absence of affidavit based on personal knowledge, evidentiary hearing is unnecessary); United States v. Clement, No. 94 Cr. 928, 1995 WL 151786, at *2 (E.D.N.Y. March 29, 1995) (denying motion to suppress statements, where motion was unaccompanied by sworn affidavit); United States v. Burmby, No 92 Cr. 721, 1992 WL 373686, at *3 (E.D.N.Y. Nov. 30, 1992) (denying motion to suppress statements because unsupported by affidavit of personal knowledge).

### B.     BROWN's January 30, 2003 Statement Was Not Made While in Custody

It is well-established that a defendant, upon arrest, must be advised of her rights before law enforcement officers begin any interrogation.  Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997).  However, the Miranda advice-of-rights requirement applies only when the defendant is in the custody of the law enforcement officers interrogating him.  Illinois v. Perkins, 496 U.S. 292, 296 (1990).  In fact, the police are not required to administer Miranda warnings to everyone whom they question.  Miranda v. Arizona, 384 U.S. 436, 477-488 (1967); United States v. Clark, 525 F.2d 314 (2d Cir. 1975).  Nor is there a requirement that the warnings be given merely because the interview takes place at a station house. California v. Beheler, 463 U.S. 1121 (1983); Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  In this case, BROWN was not in custody at the time of her interview.  Notably, BROWN was not placed under arrest that day and was driven home at the end of the interview.  She was not arrested on the material witness warrant until several months later, in August 2003.  Consequently, the law

enforcement officers interviewing the defendant were not obligated to advise her of her rights.

In addition, the evidence adduced at a hearing will establish that BROWN was under no compulsion to speak to law enforcement officials.  The evidence will show that law enforcement officers advised her that she was under no obligation to speak to them.  The evidence will also show that BROWN was free to terminate the interview at any time by informing the interviewing officers that she no longer wanted to speak with them.  Under such circumstances, where the defendant was free to terminate her conversation with law enforcement officers at any time, her statement should not be suppressed.  See Willoughby, 860 F.2d at 24.

Accordingly, defendant BROWN's statement should not be suppressed because she has failed to allege any facts indicating that it was a custodial interrogation, and because the evidence adduced at a hearing will establish that the interview was non-custodial.

C.    **The Government Does Not Intend to Offer BROWN's August 1, 2003 Statement at Trial**

The government does not intend to introduce defendant BROWN's August 1, 2003 statement in its case-in-chief.  In the event that the government seeks to introduce any portion of the statement during the defense case, a brief voluntariness hearing would be required.

D.    **BROWN's November 10, 2004 Statement Was Spontaneous and Not the Product of Custodial Interrogation**

A defendant's Sixth Amendment right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."  Kirby v. Illinois, 406 U.S. 682, 688-89 (1972).  The government bears a "heavy burden" to show a knowing and intelligent waiver of Sixth Amendment rights under these circumstances.  Brewer v. Williams, 430 U.S. 387, 403 (1977).  However, use of

28

a post-indictment statement may be permitted where it was made voluntarily and unexpectedly to a representative of the government.  United States v. Gaynor, 472 F.2d 899 (2d Cir. 1973); United States v. Garcia, 377 F.2d 321 (2d Cir. 1967).

If an accused has expressed a desire to deal with the police only through counsel, she may not be subject to further interrogation until counsel has been made available to her, and counsel is present, Minnick v. Mississippi, 495 U.S. 903 (1990), unless the accused initiates further discussions with the police.  Edwards v. Arizona, 451 U.S. 477, 484-485 (1977).  Generally, "initiate further discussions" involves a two-step inquiry.  First, did the accused initiate the conversation with the police, and second, did he waive his right to counsel knowingly and intelligently under the totality of the circumstances.  Oregon v. Bradshaw, 462 U.S. 1039 (1983).  However, Miranda was designed to curb unfair methods of custodial interrogation.  Thus, Miranda rights do not attach to volunteered statements, but rather only to those which are the product of interrogation.  United States v. Vigo, 487 U.S. F.2d 295 (2d Cir. 1973); United States v. Purin, 486 F.2d 1363, 1367 (1973).  Accordingly, Miranda rights do not attach to excited or spontaneous utterances.  Stanley v. Wainwright, 604 F.2d 379 (5th Cir. 1979).

Under these standards, BROWN's November 2004 statements should not be suppressed because she volunteered them to Detective Castiglia.  See Miranda v. Arizona, 384 U.S. 436 (1966).   BROWN initiated the conversation with Detective Castiglia by asking him whether he had children.  When he replied that he did, BROWN stated that having children would help him understand what she was about to say, "even though her lawyer told her not to."   BROWN volunteered her subsequent statements about the homicide without questioning.

IV.    **DEFENDANT PAYLOR'S SEVERANCE MOTION IS PREMATURE**

      Defendant VASH-TI PAYLOR moves to sever her trial from that of her co-defendants.  The sole basis for her motion is that "a death-qualified jury will be required to try the murder charges against [her co-defendants]."   However, because no decision has been made whether to seek the death penalty against any of her co-defendants, PAYLOR's severance motion is premature.  In the event the government elects to seek the death penalty against any of PAYLOR's co-defendants, she can renew her motion at that time.

## <u>CONCLUSION</u>

Based on the foregoing, the Government respectfully submits that the defendants'
pretrial motions should be denied.

Dated:      December 8, 2005
               Brooklyn, New York

                                 Respectfully submitted,

                                 ROSLYNN R. MAUSKOPF
                                 United States Attorney
                                 Eastern District of New York

                                 _____

            By:     Carolyn Pokorny
                     Tracy Dayton
                     Assistant U.S. Attorneys
                     (718) 254-6291/6391